### OLD COLONY TRUST CO. et al. v. CITY OF ATLANTA et al.

(Circuit Court, N. D. Georgia. July 22, 1897.)

**1. BILL FOR INJUNCTION—INTEREST OF COMPLAINANTS—APPREHENSION OF LOSS.**

Bondholders seeking relief, by injunction, against the enforcement of an ordinance fixing rates of fare on a street railroad, have sufficient interest in the matter to give them a standing in court, if they show a well-grounded apprehension of loss by the enforcement of the ordinance.

**2. CITY CHARTER—EXTENT OF AUTHORITY—FIXING FARES ON STREET RAILROAD.**

A provision in the charter of a city authorizing it to "pass all by-laws concerning carriages, wagons, carts," etc., "and every by-law, ordinance and regulation it may deem proper for the peace, health, order or good government of the city," does not authorize it to pass an ordinance fixing rates of fare on a street railroad.

**3. CHARTER OF STREET RAILROAD—FARES SUBJECT TO MUNICIPAL APPROVAL—POWER TO FIX RATES OF FARE.**

A proviso in a street-railroad charter, "that the rates of fare and freight upon said railroad shall be subject to the approval of the mayor and city council," is not sufficient authority to the city to enact an ordinance fixing such rates of fare.

**4. SAME—EXERCISE AND EXHAUSTION OF POWER.**

A city deriving from the charter of a street-railroad company its only authority to fix rates of fare thereon exhausts such power by prescribing maximum rates in the ordinance authorizing the use of its streets for the construction and operation of such road.

**5. SAME—CONSTRUCTION OF STATUTE—AUTHORITY TO FIX FARES.**

Laws Ga. 1890-91, p. 169, validating the charter of the Atlanta Consolidated Street-Railway Company and other street railroads of the state, provides that such roads shall be liable to such "regulations" "as are other railroads and street-railroad companies incorporated by separate act or acts by the laws of this state." The charter of one street railroad, incorporated by separate act, authorized the city of Augusta to regulate rates of fare and freight thereon. *Held* not sufficient to authorize the city of Atlanta to fix rates of fare.

**6. SAME—RESERVATION OF RIGHT OF CONTROL.**

A reservation in an ordinance granting the use of streets for a street railroad that such road shall be "subject to all the laws and ordinances now in force, and such as may be hereafter made," does not authorize the city to pass an ordinance fixing rates of fare on such road, unless it is, either expressly or by necessary implication, thereto authorized by some law of the state.

Brandon & Arkwright, for Old Colony Trust Co.

Payne & Tye, for Consolidated St. Ry. Co.

N. J. & T. A. Hammond, for Seixas.

James A. Anderson and John T. Pendleton, for City of Atlanta.

NEWMAN, District Judge. This is a bill filed by the Old Colony Trust Company and Henry Seixas against the city of Atlanta and the Atlanta Consolidated Street-Railway Company. The Old Colony Trust Company sues as trustee for the holders of the bonds of the Atlanta Consolidated Street-Railway Company, the bonds so represented amounting to $2,025,000. Seixas sues as the owner of $93,000 of the first mortgage bonds of the Atlanta Street-Railroad Company, of the value of $100,000, and $37,000 of the bonds of the Atlanta Consolidated Street-Railway Company, of the value of $33,000, and of 500 shares of the capital stock of the latter company. By a decision just made, Seixas is retained in the bill as bondholder, but is dismissed so far as he complains as stockholder.

The purpose of the bill is to enjoin the city of Atlanta from enforcing the following ordinance:

"Section 1. Be it ordained by the mayor and general council, that from and after the first day of May, 1897, it shall be unlawful for any company operating electric or other railways in or upon the streets of Atlanta, by itself or its agents, directly or indirectly, to charge or collect more than five cents for the transportation of any person from any point on said line or lines owned or operated by said company whether the same be for a continuous passage on a through line or by transfer to any other line or lines owned and operated by said company.

"Sec. 2. Upon the payment of one full fare as above provided it shall be the duty of said railway company to transport such passenger to his destination upon any line or lines of said company, and to furnish a transfer ticket, without additional charge, whenever it is necessary for such passenger to change to the car of any other line or lines operated by said company in order to reach his said destination.

"Sec. 3. Any violation of the above ordinance or any refusal to furnish a transfer ticket as above provided for by any officer or agent of any street railway company in said city, shall be punished by a fine of not less than ten dollars ($10.00) nor more than one hundred dollars ($100.00), or imprisonment not less than thirty days in the discretion of the recorder."

A cross bill has been filed by the Atlanta Consolidated Street-Railway Company, in which it adopts the allegations of the original bill (except as qualified), and sets out some additional facts, and also seeks to enjoin the city from enforcing against it the above ordinance. To the original bill, as well as the cross bill, there is a demurrer by the city of Atlanta. The case has now been heard on the demurrers.

It is said on behalf of the city that neither the Old Colony Trust Company nor Seixas shows such an interest in the matter at issue as will authorize the court to hear them; that they stand upon a bare and unfounded apprehension of loss from the enforcement of this ordinance. We cannot agree to this view. On the contrary, we think that under the allegations of the bill the complainants show a reasonable and fairly well-grounded anticipation of loss of interest on the bonds, and this, we think, is sufficient. It is not necessary in a case like this that the party complainant should be required to sit by and submit to loss as a demonstration of the injuries effected by legislation, before invoking the assistance of the court. It is enough to give them a standing in court if they show a well-grounded apprehension of loss, and we think that is shown in this case.

Two questions are raised by this demurrer: First, had the city power to pass the ordinance in question? and, second, if it had such power, is the ordinance a reasonable one in its effect on the corporation and on its lien creditors?

If the first question is resolved in favor of the street-railway company, or, in other words, if it is determined that the city lacks authority to pass this ordinance, the second question need not be considered.

The power of the city to pass the ordinance is claimed by its counsel to be derived from four sources:

1. It is contended that this authority is given the city by section 15 of its charter. This section of the charter was in the original acts of incorporation of the city, and was re-enacted in what was called the "New Charter," in 1874. So far as its language is invoked here, it empowers the city "to pass all by-laws concerning * * * carriages, wagons, carts, drays," etc., "and every by-law, ordinance and regulation that it may deem proper for the peace, health, order or good government of said city." The contention is that, in the general grant of authority to pass ordinances for the order and good government of the city, such an ordinance as this is embraced. We are of opinion that the general grant of authority to pass ordinances is one which relates to the peace, order, health, etc., of the city, and is not sufficient to authorize an ordinance of this character. Special stress is laid, however, in the argument which invokes this section as a grant of power, upon the authority given to pass by-laws concerning "carriages, wagons, carts, drays," etc.; and it is said that this section having been embraced in the original city charter, granted before street railroads were known in Atlanta, and the city having been authorized and having exercised the power to fix the charges of drays and hacks, the same authority would now exist as to this new mode of conveyance. The exercise of power in these two respects is entirely different. In the case of the street-railway company there is a permanent, fixed investment, said to be over $3,000,000, made by legislative authority, and with the city's consent, and which is only valuable when used for the purpose contemplated. This enterprise is inaugurated and carried on, so far as the city is concerned, for public convenience; so far as the stockholders and bondholders are concerned, as a private investment. By depriving them of the right to receive a reasonable return on the investment made, its value as a property is totally destroyed. When it is considered that this property right exists by special legislative grant, the right to regulate its charges is a very different thing from the right to regulate the charges of a hack or dray, which may run or not as a public conveyance without destroying, or perhaps without substantially affecting, its value. This section of the city's charter, neither by the general terms employed, nor by its special reference to vehicles, gives the city the power to pass the ordinance now under consideration.

2. It is said that the power contended for is derived from the charter of the Atlanta Street-Railroad Company, which was granted in

1866. The Atlanta Consolidated Street-Railway Company is the successor of the Atlanta Street-Railroad Company, the former having bought out the latter company in 1891, and subsequently consolidated it with the other lines of street railway which the consolidated company has acquired. In the act of 1866, incorporating the Atlanta Street-Railroad Company, the company was granted "the exclusive power and authority to survey, lay out, construct and equip, use and employ street railroads in the city of Atlanta, subject to the approval of the city council thereof for each and every route selected, first had and obtained before work thereon shall be commenced; the property of said company to be subject to the same state, county and city taxes as the property of individuals in said city of like value is or may be subject to, unless the city council shall at any time think fit to exempt the same either in whole or in part, from the payment of city taxes, provided that the rates of fare and freight upon said railroad shall be subject to the approval of the mayor and city council of the city of Atlanta." It is insisted that under the language last quoted, which makes the rates of fare subject to the approval of the mayor and city council, the city has the power to fix rates. Soon after the passage of this act an ordinance was passed by the city authorizing the use of the streets, etc. The company did not build under the first ordinance, but subsequently, in 1868 or 1869, as it appears from the bill, another ordinance was passed, and under this it is alleged that the Atlanta Street-Railroad Company constructed its lines. Among other things there was a provision in the ordinance under which the lines were built that "the charges for passage on said road shall not exceed twenty cents for any through line and ten cents for half lines or short distances." We do not express any opinion upon the question raised and discussed at the bar as to whether this constituted a contract between the city and the street-railroad company from which the city could not withdraw, because other conclusions we have reached render its determination unnecessary. This much is manifest, however, that, if the city derived from the above-quoted provision of the charter of the Atlanta Street-Railroad Company any power to fix rates of fare, it exhausted that authority when it passed the ordinance referred to fixing the rates of fare at 20 and 10 cents, respectively. This, of course, so far as it derived power from the provision referred to, and not determining at all how far, with proper additional legislative authority, it might have changed this ordinance with reference to the rates of fare. But even if this power of approval of rates, etc., had been granted directly to the city, and was not a mere reservation in the charter of the street-railroad company, or if it should be here so considered, is the power to approve rates the power to fix rates originally? This was not the view of the supreme court in a case where a question quite similar to this arose. In Cincinnati, N. O. & T. P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, the supreme court was called upon to determine the right of the interstate commerce commission to fix the rates of fare for railroads doing interstate business, under the provisions of the act of congress. While the grant of power in that case was

claimed by a commission, and here it is claimed and is sought to be exercised by a municipal government, the question is very much the same. The following extract from the opinion of the court (page 196, 162 U. S., and page 705, 16 Sup. Ct.) shows the view entertained by the supreme court:

"We do not find any provision of the act that expressly or by necessary implication confers such a power. It is argued on behalf of the commission that the power to pass upon the reasonableness of existing rates implies the right to prescribe rates. This is not necessarily so. The reasonableness of the rate in a given case depends on the facts, and the function of the commission is to consider these facts and give them their proper weight. If the commission, instead of withholding judgment in such a matter until an issue shall be made and the facts found, itself fixes the rate, that rate is prejudged by the commission to be reasonable."

It will be perceived that the court concedes the right of the commission to pass upon the reasonableness of rates when made by a railroad, but denies its power to fix them originally. We do not distinguish between this authority to pass upon the reasonableness of rates and the power to "approve," and if the authority to fix rates is wanting in the one case it would seem to be wanting in the other.

3. The Atlanta Consolidated Street-Railway Company obtained a charter from the secretary of state of Georgia, and afterwards, in connection with other street railroads of the state, obtained from the legislature a validating act, because of doubts entertained as to the power of the secretary of state to grant charters to street-railway companies. This doubt afterwards proved to be well founded, when the supreme court of the state decided that the secretary of state had no such power. This validating act (Laws Ga. 1890-91, vol. 1, p. 169) provided that the street-railroad companies whose charters were thus legalized should "be subject to pave, and shall be liable for street paving and to other regulations of municipal corporations as are other railroads and street railroad companies incorporated by separate act or acts by the law of this state." It is claimed for the city that by this provision the city obtained, and the Atlanta Consolidated Company became subject to, any and all provisions of any and all charters granted street-railway companies by the legislature of Georgia; and as certain of these charters, one at least, contained a provision authorizing the city to fix rates of fare and freight, that this power was given to the city of Atlanta. There are two obvious difficulties about this contention: First, the power of "regulation" does not necessarily embrace the power to fix rates of charge. There are many matters for it to cover without embracing this latter power. The city unquestionably has the right, within any reasonable limit, to regulate the speed of cars and other matters connected with their movement on the streets; where poles shall be placed in the case of overhead wires; how wires shall be located, and their location with reference to other wires and the safety of the same; and to do many other things which might be noted with reference to the occupancy of the streets, protection to life and limb thereon, and all such matters as involve the safe and orderly use of the streets over which it has, under the legislature, full power

and control. As stated, in one charter at least, the right of the city (the city of Augusta) to regulate rates of fare and freight was given. Under the charter of the Atlanta & Edgewood Street-Railroad Company that company was authorized "to fix, charge and collect such rates for the carriage of persons and property as it may deem proper." The lines of this last company have been acquired and are now a part of the consolidated system, the Atlanta & Edgewood having sold its lines by authority of the legislature.  1 Laws 1890–91, p. 341.  There is no more reason for selecting a provision from the Augusta charter than from the Atlanta & Edgewood charter.  Indeed, if either should be selected, it would seem to be proper to take the latter as an Atlanta charter.  We think, however, that the provision referred to in the validating act is too indefinite to be taken as the basis for a grant of power such as is sought to be exercised by the city in this case.  Certainly, therefore, it cannot be held that the provision subjecting the consolidated street-railway company to such regulations as were other street railroads by acts of the legislature would authorize the city to select from the Augusta charter the power therein granted to regulate rates of fare, and apply it to the Atlanta Consolidated Company.  We cannot seriously entertain the proposition that the legislature had any such result in contemplation when it inserted this reservation in the act of 1890–91, which legalized the charter of the Atlanta Consolidated Company.

    4. It is further insisted that the power to pass this ordinance exists by reason of the reservation made by the city in the ordinance authorizing the Atlanta Consolidated Street-Railway Company to use the streets and to electrically equip its lines.  There is some difference between counsel as to the exact language of this ordinance, but, giving it the broadest meaning in favor of the city, it provided that the company should be "subject to all the laws and ordinances now in force and such as may be hereafter made."  Of course, this ordinance should be treated as contended for by counsel for the consolidated company, and the word "legally" should be read into it, and it should read as though it said such ordinances "as may be hereafter legally made"; and the question therefore recurs to, and is, what legislative grant has the city empowering it to pass this transfer ordinance?  As we do not find in any of the acts of the legislature relied upon the power to pass the ordinance, we are compelled to hold that the city exceeded its authority in passing it.  We hold, moreover, that, before the city can exercise the power to fix rates of fare for a street-railroad company, it must obtain that power in express terms, or it must arise by necessary implication from the words used in the legislative act.  The power of the state over the subject-matter need not be discussed.  We are dealing with the power of a municipality, a creature of the legislature, which derives all its authority from the legislature, and can only act within the limits of the legislative grant.  If, under any of the acts of the legislature which have been discussed, it could be held that the city had the power, by necessary implication, to regulate or to fix rates of fare for street railroads, or for this particular company, it might

be gravely questioned, even then, if it had the power to pass that part of the ordinance in question requiring transfers. It would be a subject of serious doubt, at least, if the authority to fix rates carried with it the authority to require the street-railway company to give two, three, or more rides for one fare. One continuous ride for a single fare is one thing, and two or more rides, with the necessary stoppage and letting passengers off and taking them on, is another and entirely different thing. Many reasons have been urged in argument, and others might be suggested, which in our opinion make a broad distinction between the two classes of service, namely, between a continuous ride in one car and a ride requiring transfers from one or more cars to others. Unquestionably this ordinance, as to its feature requiring transfers, is a very broad exercise of municipal power. It appears to go to the limit of municipal control even under legislative authority. The power to pass the ordinance should be clearly shown. On the contrary, it is clear to us that the city is without such power. As we entertain the opinion above expressed on the first question involved, namely, as to the power of the city to pass the ordinance in question, it is unnecessary to go into the second ground on which the ordinance is attacked in the complainants' bill. The question of the reasonableness or unreasonableness of the ordinance becomes immaterial if the city lacked legislative authority to pass it. We hold, therefore—First, that the complainants have shown such an interest in the subject-matter as to give them a standing in court to question the validity of this ordinance; and, second, that, the city being without legislative authority to pass the ordinance, the same is invalid and inoperative. For these reasons an order will be entered overruling the demurrer, both to the original and to the cross bill.

McCORMICK, Circuit Judge. The views and conclusions expressed in the foregoing opinion are the result of careful examination and conference by Judge NEWMAN and myself, and meet my full concurrence.